ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

FOR THE SOUTHERN DISTRICT OF GEORGIA

2006 NOV 22 P 12: 14

AUGUSTA DIVISION

CLERK J. Burton
SO. DIST. OF GA.

UNITED STATES OF AMERICA     )
                             )
                             )
        v.                   )     CR 106-100
                             )
NATHANIEL CULLARS, JR.       )
                             )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

In the above-captioned criminal case, the government has accused Defendant of

possession of cocaine base (crack cocaine) with intent to distribute, in violation of 21 U.S.C.

§ 841(a)(1). The matter is now before the Court because Defendant moved to suppress all

evidence arising from the search of his vehicle after he was stopped for a loud music, noise

violation. (Doc. no. 10). The Court held an evidentiary hearing on October 10, 2006,[1] at

which time the Court heard testimony from Corporal Jamie Bridges ("Corporal Bridges"),

Washington Police Department; Officer Henry G. Norman ("Officer Norman"), Washington

Police Department; Marian Hampton ("Hampton"), the passenger in Defendant's vehicle;

Nathaniel Cullars, Sr. ("Mr. Cullars"), Defendant's father; and Investigator Joseph D. Nelson

---

[1] At the hearing, the Court granted Defendant an additional twenty (20) days to submit an audio recording of Marian Hampton's statements to Investigator Joseph Nelson on the night of the incident, as well as any supplemental arguments Defendant wanted to submit to the Court on this issue. The Court also granted the government 20 days to respond to Defendant's submissions. Defendant submitted the audio recording (doc. no. 19) and the time for the government to respond has now expired.

("Investigator Nelson"), Washington Police Department.[2]  For the reasons developed more fully herein, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**.

## I.   FACTS

The events in question occurred on the evening of June 6, 2006, in Washington, Georgia.  On that night, Corporal Bridges was parked at the corner of Lincoln Drive and Jackson Street when he heard an excessive amount of music coming from an unknown source.  Because the music was gradually getting louder, Corporal Bridges presumed that the music was coming from a moving vehicle.  Shortly thereafter, the music ceased as Defendant's car came into Corporal Bridges's view, 50 to 70 yards from the stop sign at the corner where Corporal Bridges was parked.  Hampton testified that when he and Defendant were about 120 yards from the intersection, he noticed Corporal Bridges parked at the corner. Because Corporal Bridges had previously issued Hampton a citation for a loud music, noise violation, Hampton knew that Defendant's music was too loud, such that Corporal Bridges would pull them over and issue a noise violation citation.  Therefore, Hampton told Defendant to turn down the music in the vehicle.  After stopping at the corner where Corporal Bridges was parked, Defendant turned the corner and proceeded past Corporal Bridges. Corporal Bridges then did a U-turn, activated his blue-lights, and pulled Defendant over in order to issue him a citation for a noise violation based on excessively loud music.[3]

---

[2] The government invoked the Rule of Sequestration at the hearing.

[3] The facts indicate that the Washington Police Department vehicles are equipped with a video recorder that is activated when an officer turns on the vehicle's blue-lights. However, the tape in Corporal Bridges's vehicle had ended prior to the above incident.

As Corporal Bridges pulled Defendant over, he saw Defendant reach toward the center of the vehicle, as if trying to conceal something. Corporal Bridges testified that, based on his training and experience, most people remain still in their vehicles until the officer approaches and asks them to produce a license and registration. After seeing these movements, Corporal Bridges became suspicious and decided that a search might be warranted, so he called for back-up. Corporal Bridges then approached Defendant's vehicle and explained to Defendant that he had been stopped for playing excessively loud music and Corporal Bridges was issuing him a noise violation citation. While Corporal Bridges was talking to Defendant, he noticed open containers of alcohol at Hampton's feet. Corporal Bridges then walked over to the passenger's side of the vehicle and asked Hampton if they had been drinking in the car. Hampton told Corporal Bridges that they both had been drinking and handed the open alcohol containers to Corporal Bridges. Corporal Bridges then returned to the driver's side of the vehicle and took Defendant's driver's license and registration.

As Corporal Bridges was walking back to his vehicle to check Defendant's license and registration, he noticed that Defendant was making suspicious movements and appeared to be trying to stuff something under the seat. At that same time, Officer Norman arrived on the scene, so Corporal Bridges asked Officer Norman to watch Defendant and Hampton while he called in Defendant's license and registration.

---

Because the Training Officer is the only person who has the authority to change the tape in the police vehicles, and that particular Officer was not available on June 6, 2006, Corporal Bridges's video recorder was unable to videotape the traffic stop of Defendant.

3

Meanwhile, as Officer Norman walked up to Defendant's vehicle, he noticed that Defendant had reached into the back of the car. Officer Norman testified that at that point, he saw Defendant's hand clenched around something with a shiny plastic object sticking out of his fist. He stated that he asked Defendant what was in his hand several times, and each time Defendant replied, "Nothing."[4]  However, Hampton testified that Defendant had a compact disc ("CD") case in his lap and was putting the case in the back of the vehicle. He further stated that Defendant showed Officer Norman the CD case in his hand. Regardless of whether the CD case was present, the facts indicate that Officer Norman thereafter grabbed Defendant's hand, and after a brief struggle, Officer Norman pried baggies of crack cocaine out of Defendant's hand. While the struggle occurred, Corporal Bridges ran over to the car and arrived in time to take the baggies of crack cocaine from Officer Norman and place Defendant under arrest. After both Defendant and Hampton were searched for weapons and Defendant was secured in a patrol vehicle, Corporal Bridges and Officer Norman searched Defendant's vehicle. In Defendant's glove box, Officer Norman found a grey and white pouch that contained crack cocaine, baggies, and a scale.

Shortly after the drugs were seized, Mr. Cullars arrived on the scene, having been called by his daughter who had showed up before the completion of the search. Mr. Cullars is a member of the Washington City Council and serves on the Committee that oversees and monitors the conduct of the City Police Department. When Mr. Cullars arrived on the scene,

---

[4] According to Officer Norman's testimony, when Officer Norman saw Defendant reach into the back of the car, he asked Defendant what he was doing. Defendant replied, "Nothing."  Officer Norman then asked Defendant, "What do you have in your hand?" Defendant replied, "Nothing."

he was upset, demanded answers from Corporal Bridges and Officer Norman as to why a traffic stop became a drug arrest, and insisted that the Chief of Police be called. Mr. Cullars was described as belligerent and unresponsive to the officers' orders not to interfere with their investigation.

Mr. Cullars testified that he was aware of the taping systems in the police vehicles and had told the Chief of Police, prior to this incident, that there had been incidents where Corporal Bridges had not taped his traffic stops. Mr. Cullars also complained to the Chief that Corporal Bridges had been following his son around and wanted it stopped. Mr. Cullars indicated that the Chief had told him that the situation had been addressed. Mr. Cullars further testified that after the incident, he "may have" spoken about firing Corporal Bridges over his son's arrest.

## II.   DISCUSSION

### A.   Probable Cause to Stop the Vehicle

In his motion, Defendant argues that Corporal Bridges did not stop him based on a reasonable suspicion of criminal activity, namely a loud music violation, but stopped him as a continued pattern of harassment based on Corporal Bridges's animosity toward Mr. Cullars. However, Defendant's claim forms no basis for recommending suppression. In general, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Moreover, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Id. at 813.

5

In the case at bar, the evidence presented at the hearing demonstrates that probable cause existed for the traffic stop. Specifically, Corporal Bridges testified that he issued Defendant a citation for a noise violation pursuant to Ga. Code Ann. § 40-6-14. Section 40-6-14 states:

> It is unlawful for any person operating or occupying a motor vehicle on a street or highway to operate or amplify the sound produced by a radio, tape player, or other mechanical sound-making device or instrument from within the motor vehicle so that the sound is plainly audible at a distance of *100 feet* or more from the motor vehicle.

Ga. Code. Ann. § 40-6-14(a) (emphasis added). Corporal Bridges testified that when he heard the excessively loud music, he presumed it was coming from a moving vehicle. He stated that Defendant's vehicle became visible 50 to70 yards from where Corporal Bridges had been parked; a distance well beyond the 100 feet required by the statute. Moreover, Hampton corroborated Corporal Bridges's testimony when he stated that (1) they were about 120 yards from the stop sign when he saw Corporal Bridges, and (2) at that point in time, he told Defendant to turn down the music because it was loud enough that he knew Corporal Bridges would issue Defendant a noise violation citation. Thus, there is ample evidence in the record that Defendant's music was excessively loud from a distance of more than 100 feet and therefore, probable cause existed for the traffic stop. Accordingly, any subjective intent that Corporal Bridges may or may not have had in stopping Defendant is irrelevant.[5]

---

[5] Defendant seemingly attempts to argue that the fact that Corporal Bridges did not videotape the stop casts doubt on either Corporal Bridges's credibility or whether there was probable cause for stopping the vehicle. However, Corporal Bridges testified that the tape had ended and the only person with authority to change the tape, the Training Officer, was not on duty and was unavailable to change the tape. Moreover, Officer Norman corroborated Corporal Bridges's testimony as to the tape and the procedures for changing the tape.

### B.    Scope of Stop Did Not Exceed its Lawful Objective

Defendant further asserts that even if the stop had been for a lawful purpose, the search of his vehicle "far exceeded the scope of the stop." Although Defendant did not articulate in his suppression motion how the search exceeded the scope of the stop, it appears from counsel's remarks at the suppression hearing that he challenges Officer Norman's seizing the drugs from Defendant's hand and the subsequent search of the vehicle.[6]

### 1.    Seizure of Drugs from Defendant's Hand

Under Terry v. Ohio, 392 U.S. 1, 30 (1968), the police may briefly stop and detain persons in order to investigate a reasonable suspicion that those persons are involved in criminal activity, even in the absence of probable cause to believe that a crime has been committed.  United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).  Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop.  Terry, 392 U.S. at 21; see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir.

---

Further, even if Corporal Bridges's video recorder had been working properly, the recorder would not have been activated until after Corporal Bridges turned on his blue-lights. Because the blue-lights were not on when Corporal Bridges heard Defendant's loud music, the tape would not have recorded the sound of the music or Defendant's vehicle as it approached the intersection where Corporal Bridges had been parked.  Therefore, the video tape, or lack thereof, has no bearing on this aspect of Defendant's suppression motion.

[6] To the extent that Defendant may be arguing that the search was unlawful based on Corporal Bridges's animosity toward Mr. Cullars, this argument is without merit.  Because Officer Norman seized the drugs from Defendant's hand and found the drugs in Defendant's glove compartment, there is no evidence indicating that Corporal Bridges was directly involved in either of these seizures.  Nor is there any evidence that Officer Norman was conducting the searches based on any animosity toward Defendant or Mr. Cullars.

1999). Although the "reasonable suspicion" required for a <u>Terry</u> stop is less stringent than the requirement for probable cause, <u>United States v. Mikell</u>, 102 F.3d 470, 475 (11th Cir. 1996), "reasonable suspicion" requires that an officer have more than a "hunch" that criminal conduct is afoot based on unparticularized facts. The officer must be able to articulate some minimal, objective justification for the investigatory detention. <u>United States v. Acosta</u>, 363 F.3d 1141, 1145 (11th Cir. 2004); <u>United States v. Williams</u>, 876 F.2d 1521, 1524 (11th Cir. 1989).

With respect to searches during investigatory detentions, the Supreme Court has held that:

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

<u>Terry</u>, 392 U.S. at 30. The search must be reasonably limited in scope to protecting the officer by disarming a potentially dangerous individual. <u>Sibron v. New York</u>, 392 U.S. 40, 64-65 (1968). However, where the officer pats down the outer clothing and "feels an object whose contour or mass makes its identity immediately apparent," the warrantless seizure of contraband is justified by analogy to the plain view doctrine. <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 375-76 (1993).

8

In the case at bar, despite Defendant's arguments, reasonable suspicion existed to warrant Officer Norman's seizure of the drugs from Defendant's hand. First, prior to Officer Norman's questioning Defendant, Officer Norman and Corporal Bridges had observed Defendant making suspicious movements, which suggested that Defendant had a weapon or contraband in the vehicle. Moreover, when Officer Norman approached Defendant's vehicle, he noticed that Defendant had something in his hand. When he asked Defendant about it, Defendant repeatedly stated that he had "nothing" in his hand. Officer Norman noticed that the object clenched in Defendant's hand was something shiny and plastic and testified that he thought it might be a weapon. Based on this observation and Defendant's repeated statement that he had "nothing" in his hand, Officer Norman had more than a reasonable suspicion to search Defendant's person.

Although Hampton testified that Defendant had a CD case in his hand that he was attempting to place in the back of the vehicle, Hampton's testimony is not helpful to Defendant for two reasons. First, Hampton only testified that he saw a CD case in Defendant's hand, but did not provide any evidence refuting Officer Norman's contention that Defendant may have also had some other shiny, plastic item in his hand. Moreover, when Hampton demonstrated to the Court how Defendant was holding the CD case, part of Hampton's hand was closed, which indicates that, even though Hampton testified that he did not see some other shiny, plastic object, Defendant may have been holding such an object.

Furthermore, Hampton's credibility is suspect. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of

9

witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749 (citation omitted).

During the suppression hearing, Hampton clearly articulated the events from the night in question. However, before the Grand Jury, Hampton testified differently:

> Q: Okay. Well, what I'm saying is did the officer find something in the car before you got out, not whether you know it was in there before he got in there.
>
> A: I can't clearly remember. You understand I was drinking, so I really can't -- I can't clearly remember.
>
> Q: Okay. So you don't have a clear recollection of what happened inside the car after the police officer stopped the car?
>
> A: Other than the fact that he asked him for his driver's license.

(Gov't. Ex. 1, p. 43, line 25; p. 44, lines 1-11). Even though Defendant argues that Hampton's testimony mirrored the statement he gave to police on the night in question, the fact that Hampton testified differently before the Grand Jury suggests that Hampton either perjured himself before the Grand Jury or before the Court during the suppression hearing.[7]

---

[7] Defendant has submitted an audio recording of Hampton's statements to Investigator Nelson on the night of the incident. (Doc. no. 19). Defendant argues that this statement mirrors the statement that Hampton gave to the Court at the suppression hearing; therefore, Hampton is a credible witness. Upon reviewing the audio recording, the Court notes that the recording is inaudible from 6:32-10:03, 10:10-11:23, 11:35-12:11. However the Court heard enough of the approximately 1:06:00 recording to note that Hampton's testimony at the suppression hearing generally coincided with his statements from the

10

Therefore, under the circumstances, the Court cannot credit Hampton's testimony in the face of the officers' clear, concise, and consistent testimony to the contrary.

Accordingly, the Court finds that there was reasonable suspicion for Officer Norman's search of Defendant's person, and the seizure of drugs from Defendant's hand is not subject to suppression.

### 2.    Seizure of Drugs From Glove Compartment

Defendant appears to further challenge the search of the vehicle and the seizure of drugs from the vehicle's glove compartment. "In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable cause. There are, however, exceptions." United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005). In Chimel v. California, 395 U.S. 752, 762-63 (1969), the Supreme Court held that a lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area. The Court reasoned that such searches were valid because of the need "to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape" and the need to prevent the concealment or destruction of evidence. Id.

In New York v. Belton, 453 U.S. 454, 460 (1981), the Supreme Court clarified its ruling in Chimel in cases where an officer searches the interior of an automobile incident to

_____

recorded interview. Nevertheless, the Court does not find that the tape provides any information to strengthen Hampton's credibility. Hampton's statements to the Grand Jury still clearly contradict the statement he gave to Investigator Nelson and what he testified to before the Court during the suppression hearing, thereby suggesting that Hampton either lied to the Grand Jury or to the Court in the suppression hearing.

an arrest of its occupants.  In so doing, the Supreme Court established a bright-line rule that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."  This search can include any containers located within the vehicle.  Id.

In the case at bar, the fact that Officer Norman had seized several baggies of crack cocaine from Defendant's hand provided probable cause for Defendant's arrest.  Because Defendant's arrest was supported by probable cause and was, therefore, constitutional, the Officers' subsequent search of Defendant's vehicle was a constitutional search incident to arrest.  Accordingly, the drugs and drug paraphernalia found in the glove compartment of Defendant's vehicle are not subject to suppression.

### III.    CONCLUSION

Because there was probable cause to support Corporal Bridges's traffic stop and the search of Defendant's person and vehicle was constitutional, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED.**

SO REPORTED and RECOMMENDED this day of November, 2006, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

12